UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Thomas E. Perez,<br>Secretary of Labor,<br><br>        Plaintiff,<br><br>v.<br><br>Michael P. Harris et al.,<br><br>        Defendants. | Civil No. 12-3136 (SRN/FLN)<br><br>**REPORT AND RECOMMENDATION** |

Ruben Chapa for Plaintiff.
Lincoln Loehrke for Defendants.

**THIS MATTER** came before the undersigned United States Magistrate Judge on Plaintiff's motion for summary judgment (ECF No. 31). This matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons set forth below, the Court recommends that Plaintiff's motion for summary judgment be **DENIED**.

### I. FINDINGS OF FACT

Faribault Woolen Mills Company ("Faribault") was a Minnesota company that manufactured clothing and blankets. Def.'s Opp'n Mem. 2, ECF No. 53. In 1998, Defendant Michael Paul Harris invested in the company and took a small ownership stake in Faribault. Harris Dep. 17–18, ECF No. 54-1. In 2001, Harris was hired as Faribault's President, Chief Executive Officer, and Chairman of the Board of Directors. *Id.* at 16, 27. Harris hired Gary Glienke as Faribault's Head of Human Resources in 2002, and Glienke was promoted to Vice President in 2008. *Id.* at 30–31; Glienke Decl. ¶¶ 1, 3, 4, ECF No. 46. In 2006, Harris hired Carmen Dorr as Faribault's Controller, and she was promoted to Chief Financial Officer in 2007. Dorr Decl. ¶¶ 1, 3, 4, ECF No. 34-11.

In 2005, Faribault contracted with HealthPartners Health Insurance Company ("HealthPartners") to provide health care benefits to Faribault's employees (the "Health Plan"). *See* Pl.'s Ex. E, ECF No. 33-5. Health Plan premiums were paid in part with withheld employee contributions. ECF No. 46 ¶ 8.

On January 27, 2009, Harris signed a check to HealthPartners for $22,593.02 as payment for January 2009 Health Plan insurance premiums. *See* Pl.'s Ex. L, ECF No. 34-1; ECF No. 53 at 5–6. On February 27, 2009, Harris signed a check to HealthPartners for $19,466.91 as payment for the February insurance premiums. *See* Pl.'s Ex. M, ECF No. 34-2; ECF No. 53 at 6. Due to judgment liens attached to Faribault's checking accounts, however, the accounts contained insufficient funds to cover the checks. ECF No. 54-1 at 61. On February 28, 2009, HealthPartners sent a letter to Glienke, informing him that the check for the January premium payment bounced due to insufficient funds. ECF No. 32 at 6; ECF No. 46 ¶¶ 20–21. The letter also indicated that if Faribault did not remit full payment for January and February premiums, the account would be cancelled. ECF No. 32 at 6. Glienke brought this letter to the attention of Harris in early to mid-March. ECF No. 46 ¶¶ 20, 22; ECF No. 54 ¶ 18. On March 3, 2009, HealthPartners returned to Faribault the February check for $19,466.91. Pl.'s Ex. R, ECF No. 34-6. Accompanying the check was a letter addressed to Dorr wherein HealthPartners stated it would only accept wire payments for future payments due to the fact that the January 2009 check had bounced. *Id.*

According to HealthPartners' records, Dorr spoke with HealthPartners on March 2 and March 5, 2009, where she informed HealthPartners that payment for the January and February premiums would be paid by March 30, 2009 in order to avoid termination of the Health Plan. *See* Pl.'s Ex. S at 8, ECF No. 34-7. On March 11, HealthPartners reminded Dorr and Glienke of the

2

March 30 deadline. *Id.* On March 26, Harris spoke with HealthPartners seeking a payment extension. *Id.*; *see also* ECF No. 54 ¶ 19. At that time, Faribault had insufficient funds available for full payment of the past-due premiums. *Id.* HealthPartners, however, declined to extend the deadline and terminated the Health Plan on April 1 after it failed to receive any payment by the March 30 deadline. *See* Pl.'s Ex. T, ECF No. 34-8.

Between January 9 and March 30, 2009, Faribault withheld $55,040.61 in Health Plan contributions from employee paychecks. *See* Pl.'s Ex. O, ECF No. 34-3; *see generally* Pl.'s Ex. K, ECF Nos. 36–38. Because Faribault's checks to HealthPartners were never accepted for the months of January and February, Faribault never remitted the $55,040.61 withheld in employee contributions to HealthPartners. ECF No. 32 at 7. Faribault also did not reimburse its employees for the withheld wages. *Id.*

On December 19, 2012, Hilda L. Solis,[1] former Secretary of Labor, U.S. Department of Labor ("the Secretary") brought suit against Harris, alleging that Harris violated the Employee Retirement Income Security Act ("ERISA"). *See generally* Compl., ECF No. 1. The Secretary alleges that Harris was a fiduciary of the Health Plan and breached numerous fiduciary duties, including (1) failing to act solely in the interest of the Health Plan participants in violation of 29 U.S.C. § 1104(a)(1)(A); (2) causing the Health Plan to engage in transactions which he knew or should have known constituted a transfer to, or for the benefit of, a party in interest, of assets of the Heath Plan, in violation of 29 U.S.C. § 1106(a)(1)(D); (3) dealing with the assets of the Health Plan in his own interest, in violation of 29 U.S.C. § 1106(b)(1); and (4) acting on behalf of a party whose

---

[1] At the time the lawsuit was filed, the Secretary of Labor was Hilda L. Solis. Plaintiff Thomas E. Perez replaced Solis as Secretary of Labor on July 23, 2013.

interests were adverse to the interests of the Health Plan, in violation of 29 U.S.C. § 1106(b)(2). ECF No. 1 ¶ 18(A)–(D). The Secretary seeks injunctive relief enjoining Harris from violating ERISA; removing him from any positions he may hold with respect to the Health Plan; enjoining him from serving as a fiduciary of, or as a service provider to, any ERISA-covered employee benefit plan; and ordering him to restore to the Health Plan all losses resulting from his fiduciary breaches. ECF No. 32 at 2.

The Secretary now moves for summary judgment, asserting that no genuine issues of material fact exist and the Secretary is entitled to summary judgment as a matter of law. *Id.* at 1. Harris opposes the motion, arguing that he was not an ERISA fiduciary as to the actions subject to the Complaint, and even if he were, he did not breach any fiduciary duties. ECF No. 53 at 1–2.

## II. STANDARD OF REVIEW

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Larson*, 327 F.3d 762, 767 (8th Cir. 2003). A disputed fact is material only if it might affect the outcome of the case under the governing substantive law, and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Khoury v. Grp. Health Plan, Inc.*, 615 F.3d 946, 952 (8th Cir. 2010).

## III. LEGAL ANALYSIS

**A.     ERISA governs the Health Plan**

ERISA applies to "any employee benefit plan if it is established or maintained . . . by any employer engaged in commerce or in any industry or activity affecting commerce." 29 U.S.C. § 1003(a). "Employee benefit plan" is defined as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." *Id.* § 1002(3). An "employee welfare benefit plan" means "any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . . ." *Id.* § 1002(1).

As stated above, Faribault manufactures clothing and blankets. In 2005, Faribault obtained a health insurance policy from HealthPartners for the purpose of providing health care benefits for its employees. *See* Pl.'s Ex. E. Therefore, the Court finds that the Health Plan was an employee benefit plan within the meaning of ERISA.

**B.      Harris's fiduciary status**

The Secretary alleges that Harris breached certain ERISA fiduciary duties he owed to the Health Plan. *See* ECF No. 1 ¶ 18; ECF No. 32 at 12. Therefore, the threshold question this Court must answer before addressing the allegations of breach is whether Harris was in fact a Health Plan fiduciary under ERISA. *See Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) ("In every case charging breach of ERISA fiduciary duty, . . . the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.").

Under ERISA, "a person is a fiduciary with respect to a plan to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). Plan assets include employee contributions to benefit plans which are withheld from employees' paychecks, even though the contributions have not actually been delivered to the benefit plan. *United States v. Grizzle*, 933 F.2d 943, 947 (11th Cir. 1991). Faribault withheld money from employees' paychecks for the specific purpose of contributing the withholdings to the Health Plan. Faribault employees' contributions were therefore plan assets under ERISA. Accordingly, in order for Harris to be considered an ERISA fiduciary, he must have exercised discretionary authority or control over these plan assets or the management of the Health Plan.

The Secretary argues that Harris "exercised authority [and] control respecting management or disposition of [the] employee contributions when he caused Faribault to not remit them to HealthPartners." ECF No. 32 at 10 (internal quotation marks omitted). According to the Secretary, Harris had final authority over decisions related to the Health Plan. ECF No. 32 at 5. He was a signatory on the account Faribault used to pay the Health Plan insurance premiums, and he had the ultimate authority over what bills were to be paid and in what order. *Id.* at 10–11; *see* Pl.'s Ex. I, ECF No. 33-9; Pl.'s Ex. L, ECF No. 34-1; Pl.'s Ex. M, ECF No. 34-2. Harris signed both the January 2009 check that bounced and the February 2009 check that HealthPartners returned. ECF Nos. 34-1 and 34-2. The Secretary also asserts that according to Glienke and Dorr, Harris was in charge of the Health Plan, including payment of plan premiums, and Harris had to approve all decisions regarding the Health Plan. ECF No. 46 ¶ 10. Dorr claims that although she reported to Harris what expenses were being paid on a daily basis, it was Harris's responsibility to approve

every expense before it was paid. ECF No. 34-11 ¶¶ 14–15. This included approving checks for the Health Plan. *Id.*

Additionally, the Secretary argues that Harris was well aware of Faribault's failure to remit Health Plan premiums to HealthPartners; Harris was provided with monthly financial statements, he was informed of the unremitted payments in early March, and he spoke with HealthPartners at the end of March seeking more time to pay the overdue premiums. ECF No. 32 at 11. With this knowledge in hand, the Secretary alleges, Harris chose to pay other corporate bills instead of paying the overdue Health Plan premiums. Pl.'s Reply Mem. 7, ECF No. 61. According to the Secretary, these actions show that Harris exercised control over plan assets and was an ERISA fiduciary.

Contrastingly, Harris argues that he was not an ERISA fiduciary. ECF No. 53 at 10–17. While Harris admits that he signed the checks in question, he claims that these checks were, as a matter of policy, "reviewed, prioritized, written, and presented to him by Dorr and Glienke." ECF No. 53 at 12; *see also* ECF No. 54 ¶¶ 7–10, 13, 14. According to Harris, it was Dorr's job as Chief Financial Officer to exercise authority and control in managing cash flow, to choose the order in which bills were paid, and to structure Health Plan payments. ECF No. 54 ¶¶ 7–8. Accordingly, Harris believed that when a check was presented to him by Dorr, the company had funds in its account to cover the check. *Id.* ¶¶ 9–10, 13. Harris therefore argues that the fact that he supervised individuals who had control over plan assets does not mean he is an ERISA fiduciary himself. ECF No. 53 at 13.

The Court finds that an issue of material fact exists as to whether Harris was an ERISA fiduciary of the Health Plan. In *LoPresti v. Terwilliger*, 126 F.3d 34 (2d Cir. 1997), the Second Circuit addressed the issue of whether two individuals were ERISA fiduciaries. In that case, Donald

Terwilliger was the company president and 51% shareholder, while his brother John held the remaining 49%. *Id.* at 37. Donald and John were both signatories on the company account used to pay the funds at issue in the case. *Id.* at 40. Donald had a role in determining which bills and creditors were to be paid out of the company's general account and when those creditors were to be paid. *Id.* John, on the other hand, had no responsibility for determining which of the company's creditors would be paid or in what order. *Id.* The Second Circuit stated, "Donald's commingling of plan assets with the Company's general assets, and his use of those plan assets to pay the Company creditors, rather than forwarding the assets to the Funds means that he 'exercise[d] . . . authority or control respecting . . . disposition of [p]lan assets,' and hence is a fiduciary for purposes of imposing personal liability under ERISA." *Id.* Conversely, the court found that unlike Donald, John "did not exercise authority or control regarding the disposition of plan assets," and thus was not personally liable for breach of fiduciary duty. *Id.* at 41.

In *Finkel v. Romanowicz*, 577 F.3d 79 (2d Cir. 2009), the court reiterated its holding in *LoPresti*. The *Finkel* court was tasked with deciding whether Joseph Romanowicz, a principal of the company at issue in the case, was a fiduciary. *Id.* at 81. Although Romanowicz was the person in charge of signing the checks that remitted payments to the funds at issue, the court found that he was not a fiduciary. Citing *LoPresti*, the court stated, "We have held that even where an individual (1) was an officer of a company, (2) was authorized to sign checks on the company's account, and (3) had some general knowledge that deductions were made from employees' wages, he still was not an ERISA fiduciary because he had no responsibility for determining which of the company's creditors would be paid or in what order." *Id.* at 86 (citing *LoPresti*, 126 F.3d at 40) (internal quotation marks omitted). Thus, although Romanowicz signed checks on the company's behalf and

maintained plan assets, he did not select investments and he was not responsible for determining which of the company's creditors would be paid or in what order. *Id.*; *see also Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 28 (2d Cir. 2002) ("[T]he management or disposition language in ERISA refers to the common transactions in dealing with a pool of assets: selecting investments, exchanging one instrument or asset for another, and so on."). Therefore, the court held that Romanowicz was not a fiduciary under ERISA. *Finkel*, 577 F.3d at 87.

Finally, in *Trustees of the Graphic Communications International Union Upper Midwest Local 1M Health and Welfare Plan v. Bjorkedal*, 516 F.3d 719 (8th Cir. 2008), the Eighth Circuit addressed whether the defendant was an ERISA fiduciary. The court found that the defendant was not personally involved in the decision to not remit the employee withholdings to the fund at issue or involved in any of the decisions regarding which creditors got paid and which did not. *Id.* at 733. The court further found no evidence showing that the defendant exercised any authority over the employees' withholdings. *Id.* Therefore, the court held that the defendant was not an ERISA fiduciary. *Id.*

The aforementioned cases make clear that the fact that a corporate officer has check signing authority on the account holding plan assets and used to pay insurance premiums does not automatically make that corporate officer an ERISA fiduciary. To be a fiduciary, the individual must exercise some authority and control over the management or disposition of the employee contributions. When an individual makes decisions about the priority of creditors and bills to pay, this evidences such authority and control.

Here, there is conflicting testimony over whether Harris was responsible for prioritizing what corporate bills and creditors should be paid. Dorr stated that her sole responsibility with regard to

9

the Health Plan was to report to Harris when the monthly payment was due. ECF No. 34-11 ¶ 12. Dorr claimed that as CFO she provided Harris with a daily spreadsheet of all monies owed and Harris would decide how and what bills to pay. *Id.* ¶ 16. Dorr also stated that she would report to Harris when Faribault did not have enough money to pay all of its bills, and Harris would determine which bills to pay. *Id.* ¶ 20. Similarly, Glienke testified that Harris was in charge of all decisions regarding the Health Plan, including payment of all health premiums. ECF No. 46 ¶ 10.

According to Harris, however, Glienke was responsible for maintaining the Health Plan—he chose the insurance carrier. ECF No. 54 ¶ 6; *see also* ECF No. 54-1 at 30–31. Additionally, Dorr was the person responsible for cash flow, accounts receivable, and accounts payable. ECF No. 54 ¶ 5. She determined how and when bills should be paid. *Id.*; ECF No. 54-1 at 59–60, 66. With respect to corporate expenditures, Harris claims that Dorr's job was to review and prioritize bills. ECF No. 54 ¶ 7. She controlled cash flow and she determined the relative priority of which bills to pay. *Id.*; ECF No. 54-1 at 66. Dorr would either write checks for Harris and give them to him for his signature, or she would give Harris a list of expenditures, highlighting the bills which she approved for payment. ECF No. 54 ¶ 7. According to Harris, he would sign these checks upon the belief that Dorr's authorization meant that sufficient funds existed for the checks to clear. *Id.*

The Secretary attempts to avoid these issues of material fact by arguing that this Court should not consider Harris's "self-serving affidavit" because the affidavit is not consistent with his deposition testimony or based on personal knowledge. ECF No. 61 at 1–3. Accordingly, the Secretary has separately moved to strike the affidavit from the record. *See* Mot. to Strike, ECF No. 63. While the Court has considered and dismissed these arguments in its Order denying the Secretary's motion to strike, which is being issued concurrently with this Report and

Recommendation, the Court believes it prudent to reiterate its holding regarding one of the arguments made by the Secretary in its motion to strike concerning inconsistencies between the statements made in Harris's affidavit and statements Harris made during his sworn deposition.

The Secretary argues that the declarations made by Harris in his affidavit regarding Dorr's responsibility to pay and prioritize bills are not consistent with his deposition testimony. The Court disagrees. When asked about Dorr's role during his deposition, Harris stated:

> A: The CFO's job is to garner data, take care of the bills, manage her team and manage the cash flow, as good or as bad as it is
> And where the issue at hand comes to play is that I did not sit down and tell her what bills to pay and what bills not to pay, when it came to the critical bills of life meaning pay the employees, pay the taxes, pay the insurance premiums, okay?
> . . .
> Q: And when you had these discussions did you give [Dorr] priorities of what bills should be paid first?
> A; No, she gave me the priorities . . . .

ECF No. 54-1 at 59–60. Later in his deposition, Harris stated:

> So on a daily basis she had control, okay? She knew there were certain things that had to be—there was no discussion. There's no discussion that payroll has to be made, there's no discussion that taxes have to be paid, there's no discussion. I never said don't pay this. And so she paid things.

*Id.* at 66. Harris also stated during his deposition, "[Dorr is] under board authorization not to pay anything unless the funds are in the account. So whatever it is that they need, it's her obligation to figure out what not to pay, and for her to pay it." *Id.* at 71.

The Secretary points to one statement in Harris's deposition as evidence that Harris controlled what bills to pay. After Harris stated that Dorr was in charge of prioritizing what bills to pay, the attorney questioning Harris stated that it "sounds like [Dorr] wasn't accountable to anyone when she made the decision on what to pay and what not to pay." *Id.* at 71. Harris responded:

11

> I don't know how to answer that. I mean I'm not going to sit here and say I'm a non event as a chairman and CEO and president of a company regardless of what role I was active or not active in. I'm not going to sit here and say that, I'd be lying. I mean I had authority and power here but I didn't abuse it and I didn't overextend it . . . . And Carmen Dorr did not run around like a free-wheeled chicken. And the board of directors . . . said don't write any checks that you don't have any money for . . . . And so having then conversations with my board members, they were in constant touch with her. . . So at the end of the day it was me and the board controlling her."

*Id.* at 71–72. The Secretary points to this specific statement as proof that Harris controlled which bills to pay. ECF No. 64 at 9. This statement, however, does not clearly indicate that Harris controlled the decisions of what bills to pay. It simply shows that Dorr was generally supervised by Harris and the Board of Directors. As stated earlier, the fact that an individual supervises an ERISA fiduciary does not mean that he is a fiduciary himself. *See In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 760–61 (S.D.N.Y. 2003). Thus, the Court concludes that Harris's affidavit is not inconsistent with his deposition testimony.

In deciding whether to grant a motion for summary judgment, the facts are viewed in the light most favorable to the non-moving party. *Coates v. Powell*, 639 F.3d 471, 475 (8th Cir. 2011). Based on the evidence provided to the Court by both parties, it is clear that there are material facts at issue regarding whether Harris was an ERISA fiduciary of the Health Plan. As such, the answer to the threshold question of whether Harris was an ERISA fiduciary is more appropriately determined by a jury. "Credibility determinations, the weighing of the evidence, of the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Therefore, because genuine issues of material fact exist as to the threshold question of whether Harris is an ERISA fiduciary, the Court declines to address the issues of whether Harris breached any fiduciary duty under ERISA.

## IV. RECOMMENDATION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**.

DATED: January 14, 2015　　　　　　　　　　　　　　*s/Franklin L. Noel*
　　　　　　　　　　　　　　　　　　　　　　　　FRANKLIN L. NOEL
　　　　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **January 29, 2015**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **January 29, 2015,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.