## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Thomas E. Perez, Secretary of Labor, United States Department of Labor,<br><br>Plaintiff,<br><br>v.<br><br>Michael Paul Harris and the Faribault Woolen Mills, Inc. Fully Insured Hospital Life Welfare Plan,<br><br>Defendants. | Case No. 12-CV-3136 (SRN/FLN)<br><br><br>**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT** |

Ruben R. Chapa, Office of the Solicitor, U.S. Department of Labor, 230 South Dearborn St., Room 844, Chicago, IL 60604; and Susan J. Willer, Office of the Solicitor, U.S. Department of Labor, Two Pershing Square, 2300 Main Street, Suite 1020, Kansas City, MO 64108, for Plaintiff.

Lincoln Loehrke, Dorsey & Whitney, 50 South Sixth St., Suite 1500, Minneapolis, MN 55402, for Defendant Michael Paul Harris.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

This matter came before the undersigned for a final pre-trial conference on June 5, 2015, at which Plaintiff Secretary of Labor's Motion in Limine to Narrow the Issues at Trial [Doc. No. 93] was taken under advisement, and for a bench trial on June 23, 24, and 29, 2015.  Plaintiff Secretary of Labor was represented by Ruben R. Chapa and Susan J. Willer, and Defendant Michael Paul Harris was represented by Lincoln Loehrke.  The parties subsequently submitted Proposed Findings of Fact and Conclusions of Law [Doc. Nos. 122,

124], as well as post-trial briefs regarding damages and injunctive relief [Doc. Nos. 123, 125].  Based on the evidence presented at trial, the legal arguments in the parties' briefing, and all of the files, records, and proceedings in this matter, the Court makes and enters the following Findings of Fact and Conclusions of Law.

## II.    FINDINGS OF FACT

### Background

1.      In this case, Plaintiff Secretary of Labor ("the Secretary") alleges that Defendant Harris was a fiduciary to the Faribault Woolen Mills, Inc. Fully Insured Hospital Life Welfare Plan ("Health Plan") and that he breached his fiduciary responsibilities under the Employee Retirement Income Security Act of 1974 ("ERISA") by failing to remit $55,040.61 in employee contributions to the Health Plan between January 9, 2009 and March 20, 2009.  (Pl.'s Trial Br. [Doc. No. 101] at 1; Pl.'s Trial Ex. 1 (Compl. ¶¶ 15–16).)

2.      In particular, the Secretary asserts that Harris breached his duty of loyalty to the Health Plan participants in violation of ERISA § 404(a), 29 U.S.C. § 1104(a), and caused the Health Plan to engage in prohibited transactions in violation of ERISA § 406, 29 U.S.C. § 1106.  (Pl.'s Trial Ex. 1 (Compl. ¶ 18).)  The Secretary seeks to enjoin those acts and practices, and to obtain appropriate equitable relief for the breaches of fiduciary duty under ERISA § 409, 29 U.S.C. § 1109.  (Id. (Compl. ¶ 1).)

### Faribault Mills

3.      Faribault Woolen Mills Company ("Faribault Mills") was established in Minnesota in 1865 and operated as a blanket manufacturer until 2009, when it ceased operations.  (Joint Stip. [Doc. No. 127] ¶¶ 5–6.)

4.      Harris became Faribault Mills's Chief Executive Officer ("CEO"), President, and Chairman of the Board of Directors in 2001.  (Id. ¶¶ 7–8.)

5.      Faribault Mills hired Gary Glienke in 2002 as Faribault Mills's Head of Human Resources and promoted him to Vice President of Human Resources.  (Id. ¶ 12.)

6.      Faribault Mills hired Carmen Dorr as its Controller in 2006 and promoted her to Chief Financial Officer ("CFO") in 2007.  (Id. ¶ 13.)

7.      In addition to the CFO, Faribault Mills's Finance Department also employed a Controller and Accounts Payable and Accounts Receivable personnel.  (Id. ¶ 14; Tr. 162:18-23.)[1]  The individuals holding these positions reported to Dorr.  (Tr. 162:7-12.)

8.      Both Glienke and Dorr, as well as the Head of Information Technology, the Vice President of Customer Relationship Management, and at least one plant manager, reported to Harris.  (Tr. 483:17-22.)

9.      In 2009, the Schwan Foundation was Faribault Mills's majority shareholder and creditor.  (Joint Stip. ¶ 10.)  Harris owned 0.3% or less of Faribault Mills's outstanding stock and had common options.  (Id. ¶ 9.)

**The Health Plan**

10.     Glienke worked with an insurance broker to ascertain the best health plan for Faribault Mills.  (Joint Stip. ¶ 17.)

---

[1]      The trial transcripts can be found at Docket Nos. 119, 120, and 121.  Docket No. 119 contains pages 1 through 214, Docket No. 120 contains pages 215 through 392, and Docket No. 121 contains pages 393 through 571.

11.     The Health Plan was a fully-insured employee benefit plan.  (Joint Stip. ¶¶ 2, 21.)  From at least January 1, 2007 through April 1, 2009, the Health Plan was administered in Faribault, Rice County, Minnesota.  (Id. ¶ 3.)

12.     Faribault Mills sponsored the Health Plan and was the Plan Administrator. (Id. ¶¶ 18–19.)

13.     The Health Plan contracted with HealthPartners Health Insurance Company ("HealthPartners") to provide health care benefits to its participants.  (Id. ¶ 20.)

14.     Employee health insurance premiums were due to HealthPartners on the first of every month to provide insurance coverage for that month.  (Tr. 347:3-6; see Pl.'s Trial Ex. 286.)  Harris was aware that the payments were due monthly.  (Tr. 538:7-9.)

15.     Glienke would receive and rectify the bills from HealthPartners for health insurance premiums.  (Joint Stip. ¶ 17.)  He would then send the bills to Carla Craig, the Accounts Payable Administrator at Faribault Mills.  (Tr. 256:5-16, 264:5-11.)

16.     The health insurance premiums were funded 100% by employee contributions, and the premiums were withheld by Faribault Mills from the employee-participants' paychecks.  (Tr. 221:22–222:19; see Pl.'s Trial Exs. 159–76, 178–93, 195–263, 292.)

17.     From at least January 1, 2008 to April 1, 2009, Faribault Mills's employee wages were paid on a biweekly basis from checking account number XXXXXX3830. (Joint Stip. ¶¶ 23–24.)  The deductions for the Health Plan insurance premiums were made for each of the 26 paychecks that Faribault Mills issued each calendar year.  (Tr. 226:21–227:11.)

4

18.    The withheld health insurance premiums were not set aside in a separate account.  (Tr. 77:4–78:13.)  Rather, they were identified with an entry in the payroll register and held as a liability until paid.  (Id.)

19.    The premiums were paid to HealthPartners from the operations account, checking account number XXXXXX2386, from which Faribault Mills also paid general corporate expenditures.  (Joint Stip. ¶ 25.)

### Control of Financial Matters at Faribault Mills

20.    From January 1, 2008 through April 1, 2009, Harris, Dorr, and Glienke had signatory authority on Faribault Mills's checking and corporate bank accounts, ending with account numbers 3769, 3830, 2386, and 3764, including accounts used to pay payroll and health insurance premiums.  (Id. ¶ 22.)

21.    The testimony regarding Dorr's and Harris's respective roles as to financial matters at Faribault Mills is somewhat conflicting.

22.    On the one hand:

    a.  Dorr testified that the Finance Department received Faribault Mills's bills, estimated cash flows, communicated with Faribault Mills's operating personnel regarding payments necessary to satisfy business needs, estimated the amount of money to be received from customers, instructed Faribault Mills's personnel to work with vendors to alter their payment demands, acted as the primary point of contact for creditors, classified certain expenditures as important, and communicated with human resources personnel and HealthPartners

regarding insurance payments.  (Tr. 172:15-25, 173:1-21, 190:21-23, 433:20-24, 434:17-19, 436:17-23; Def.'s Trial Ex. 10.)

b.  Dorr testified that, as CFO, her duties included creating periodic financial statements and general ledger statements, collecting the cash flow information for Harris, and maintaining stocks and notes.  (Tr. 35:14–37:8.)  She stated that she provided monthly financial statements for Faribault Mills's Board of Directors, including Harris, (Joint Stip. ¶ 16; Tr. 288:20-22; Pl.'s Trial Exs. 114–25), and that she discussed the cash flow reports—which included account balances, outstanding checks, and transfers and adjustments—with Harris, (Tr. 92:23–94:22; Pl.'s Trial Ex. 89).  Harris acknowledged that he received those financial statements and frequently discussed cash flow with Dorr.  (Tr. 288:20-22; 292:15-23.)

c.  According to Dorr, she would compile a list of the various creditors and vendors that needed to be paid and would bring that list to Harris for help determining which of the creditors and vendors to pay.  (Tr. 39:14–40:23.)  Some of these lists included "very important" columns that listed particular expenditures.  (Tr. 176:17–183:4; Def.'s Trial Exs. 3, 14, 15, 29.)

d.  Dorr testified that, in 2008, Harris had the ultimate authority to decide which of Faribault Mills's bills and financial obligations would be paid and in which order.  (Tr. 38:20-22, 101:1-7, 147:23–148:7.)  She stated

6

that vendors would sometimes contact Harris directly when they were not paid on time.  (Tr. 99:18–100:25; Pl.'s Trial Ex. 94.)

e.  Similarly, Dorr testified that Harris had the ultimate authority to decide which of Faribault Mills's bills and financial obligations would be paid, and in which order, during the first quarter of 2009.  (<u>See</u> Tr. 72:9-17, 110:16-21, 147:23–148:7.)  As for HealthPartners, in particular, Dorr testified that Harris would determine the timing of the wire payments and would instruct her to issue them.  (Tr. 112:4–113:11.)

f.  Dorr also testified that, during the first quarter of 2009, Harris was provided with information regarding the balance of each of Faribault Mills's bank accounts on a daily basis, if possible.  (Tr. 75:7–76:9.)  If Harris was traveling, he would be apprised of the account information through phone calls or emails.  (Tr. 76:5-9.)  Harris would direct Dorr to make transfers between the accounts as needed and also would authorize transfers from the accounts.  (Tr. 101:11-22, 445:4-9.)

g.  Likewise, Lincoln Mark Michel, a member of Faribault Mills's Board of Directors, testified that Harris was managing the day-to-day operations during the first quarter of 2009 and determined which creditors would be paid.  (Tr. 417:10–419:2.)

h. Dorr testified that Harris never advised her, at any time during her tenure as CFO, that she had the authority to determine which of Faribault Mills's bills to pay. (Tr. 72:22-25.)

i. Dorr testified that, during 2008 and 2009, she did not have the authority, without Harris's approval, to either remit plan assets to HealthPartners or to reimburse the employees of the monies that had been withheld from their paychecks. (Tr. 73:1-4, 200:11-19.)

23. On the other hand:

a. Harris, as well as Michel and Shawn Weinand, another member of the Board of Directors, testified that Harris's duties at Faribault Mills were primarily related to sales and raising capital. (Tr. 414:10-15, 451:9-17, 479:11–480:8, 481:2-5.) Harris testified that he traveled extensively to generate sales and find investors and that, although Dorr did not consult him as to each payment made to creditors while he was away, she was "very good about telling [him] when [they] needed money." (Tr. 522:13–523:17.)

b. Harris testified that he did not exercise authority regarding the day-to-day management of Faribault Mills's cash flow, but rather that Dorr exercised this authority. (Tr. 484:23–485:1, 528:7-9.)

c. Harris stated that, although Dorr reported to him, she had authority to make decisions on her own. (Tr. 483:17-25.) Similarly, although Glienke confirmed that Harris had ultimate authority at Faribault

8

Mills, Glienke also testified that Harris did not have to approve everything.  (Tr. 207:16–208:2.)

d.  Harris testified that the Finance Department determined when and how to pay corporate expenditures, including the HealthPartners bills.  (See Tr. 486:21–487:8, 487:25–488:12, 497:7–498:22, 502:24–504:2; Def.'s Trial Ex. 34.)  However, as to the first quarter of 2009, Harris also testified that he had the authority to determine which corporate expenses would be paid.  (Tr. 290:5-10.)

e.  According to Harris, his only role with respect to the expenditure lists created by the Finance Department was to be aware of what was being paid.  (Tr. 500:14–504:4; Def.'s Trial Ex. 34.)  He testified that he signed the checks with which he was presented and did not become involved with decisions (unless there was a request by the Finance Department for help) or determine the priority of payments.  (Tr. 485:15–486:20, 498:20-22.)  However, he also testified that, on at least one instance in 2008, he made the ultimate decision about whether and how much to pay a particular creditor.  (Tr. 306:20–307:24; Pl.'s Trial Ex. 139.)

f.  Weinand testified that Dorr was his primary contact for financial information about Faribault Mills during the first quarter of 2009.  (Tr. 452:18-21.)

9

**Termination of the Health Plan**

24.      In 2008, HealthPartners sent letters to Faribault Mills indicating that the

health insurance premiums were past due for January, February, March, April, May, June,

August, September, October, and December.  (Pl.'s Trial Ex. 273.)

25.      When Glienke received these letters, he would bring them to Harris's

attention and tell Harris that the premiums were past due and had to be paid.  (Tr. 239:6-25.)

In response, Harris would usually ask Glienke to see if they could get an extension on

payment.  (Id. 240:1-3.)

26.      On at least two occasions in 2008—January 29 and November 26—Faribault

Mills issued checks, signed by Harris, to HealthPartners that were returned by Faribault

Mills's bank to HealthPartners due to insufficient funds.  (See Joint Stip. ¶¶ 27–28, 30–31;

Pl.'s Trial Exs. 274–75.)  Following the return of those checks, Faribault Mills ultimately

remitted payment of the insurance premiums to HealthPartners without loss of Health Plan

insurance coverage.  (Joint Stip. ¶¶ 29, 32.)

27.      The check issued by Faribault Mills on January 27, 2009 in the amount of

$22,593.02, to remit to HealthPartners the employee contributions for the January 2009

Health Plan premiums, also was returned due to insufficient funds.   (Id. ¶ 33; see Pl.'s Trial

Ex. 278.)  The check was signed by Harris.  (Joint Stip. ¶ 33; see Pl.'s Trial Ex. 278.)

According to Harris, the Finance Department determined when this check would be written

and paid and presented it to him for his signature, and he did not have access to the checking

account or bank statements and believed that funds would be available to satisfy the

obligation when the check was deposited.  (Tr. 486:21–487:24; Def.'s Trial Ex. 74.)  Dorr

also believed that there were funds available to cover that check.  (Tr. 163:2-11.)

28.     In a letter dated February 28, 2009, HealthPartners informed Glienke that the

January 27, 2009 check had been returned by Faribault Mills's bank due to insufficient

funds, and that HealthPartners would cancel the Health Plan if Faribault Mills did not pay in

full.  (Pl.'s Trial Ex. 280.)  Glienke testified that, when he received letters such as this, he

would inform Harris that he had received a letter stating that Faribault Mills was past due on

the premiums and that it had to be taken care of.  (Tr. 239:4-25.)

29.     HealthPartners also sent letters dated February 28, 2009 directly to the Health

Plan participants, informing them that Faribault Mills had failed to remit the premium

payments for the Health Plan.  (Pl.'s Trial Ex. 282.)

30.     Harris was insured by the Health Plan from at least January 1, 2009 to April

1, 2009, (Joint Stip. ¶ 26), and he received a copy of the letter, (Pl.'s Trial Ex. 282 at 42; Tr.

490:19–491:4).

31.     Meanwhile, on February 27, 2009, Faribault Mills issued a check, signed by

Harris, to HealthPartners in the amount of $19,466.91 to remit the employee contributions

for the February 2009 Health Plan premiums.  (Joint Stip. ¶ 34.)  As with the January 27

check, Harris testified that the Finance Department determined when this check would be

written and paid and presented it to him for his signature, and he believed that funds were

available to satisfy the check.  (Tr. 487:25–488:16; Def.'s Trial Ex. 75.)  Dorr also believed

that there were funds available to cover that check.  (Tr. 163:2-11.)  Harris stated that, at the

time that he signed the February 27 check, he did not know that the January check had been returned for insufficient funds.  (Tr. 488:17-23.)

32.     HealthPartners returned the February 27 check with a letter addressed to Dorr, dated March 3, 2009, in which HealthPartners explained that it would only accept wire payments due to the recent non-sufficient funds checks.  (Tr. 112:14–113:1; Pl.'s Trial Ex. 287.)

33.     In addition to sending letters, HealthPartners communicated with Glienke and Dorr via telephone and voice messages several times during January, February, and March 2009 regarding the premium payments for those months.  (See Tr. 365:12–367:21; Def.'s Trial Ex. 79 at 6–8.)

34.     Harris testified that he did not learn that the January and February checks had been returned until late March 2009.  (Tr. 488:24–489:6, 490:16-18.)  According to Harris, at that point, he contacted HealthPartners and requested a payment extension of the Health Plan premiums for January and February 2009.  (Joint Stip. ¶ 35; Tr. 364:10–365:2, 489:14-20.)  The date of his request was March 26, 2009.  (Joint Stip. ¶ 35; Tr. 364:10–365:2.) HealthPartners denied the request and demanded payment of the full two months' worth of premiums by March 31, 2009.  (Joint Stip. ¶ 35; Tr. 364:10–365:2, 489:14-20.)

35.     In a letter to Faribault Mills employees dated March 31, 2009, Glienke explained that Faribault Mills had been unable to meet the premium payment deadline to keep the health insurance in force and that the health insurance would be canceled.  (Tr. 257:19–258:8; Def.'s Trial Ex. 38.)  He also stated that the employees' personal contributions to pay for the insurance would be refunded as soon as possible.  (Def.'s Trial

Ex. 38.)  Glienke testified that he believed it was Harris' intent to reimburse the employees.
(Tr. 258:9–259:4.)

36.     HealthPartners terminated the Health Plan on April 1, 2009, retroactive to
January 31, 2009, due to the non-payment of premiums.  (Joint Stip. ¶ 36; Pl.'s Trial Ex.
284.)

37.     According to both Harris and Dorr, Harris never instructed Dorr to not pay
the premiums to HealthPartners.  (Tr. 164:8-13, 518:6-7.)

38.     HealthPartners sent letters dated April 1, 2009 directly to the Health Plan
participants, including Harris, informing them that their health insurance coverage had
ended, retroactive to January 31, 2009, because Faribault Mills had failed to pay the
premiums.  (See Pl.'s Trial Ex. 284.)

39.     This cancellation of coverage affected 42 participants and, in some cases,
their families.  (See Pl.'s Trial Ex. 292.)

40.     The U.S. Department of Labor, Employee Benefits Security Administration
determined that $9,286.69 in health insurance claims were denied as a result of the
termination of the Health Plan.  (Def.'s Trial Ex. 64 at 3.)

**Faribault Mills's Financial Difficulties**

41.     Both Harris and Dorr testified that Faribault Mills experienced financial
difficulties in 2008 and 2009.  (Tr. 38:17-19, 72:18-21, 508:20–509:7.)

42.     When the company ran low on funds, Dorr would speak to Harris, and he
would seek financing.  (Tr. 168:14-19, 507:9-14.)

43.     In 2008, Harris began loaning money to Faribault Mills that he and his wife procured by taking out a home equity line of credit.  (Tr. 168:20-23, 506:18–507:8.)  He eventually loaned over $960,000 to Faribault Mills.  (See Pl.'s Trial Exs. 74, 97.)  These funds were used, in part, to fund employee payroll.  (See Tr. 54:25–57:12, 507:15-18; Pl.'s Trial Ex. 64.)  Harris was never reimbursed for this loan.  (Tr. 188:4–189:18, 507:25–508:1; Pl.'s Trial Ex. 74.)

44.     In early 2009, Faribault Mills was operating from a negative cash position and did not have enough funds to pay the net payroll.  (See Tr. 167:24–168:1, 169:8-10.)  Multiple employees' paychecks bounced.  (See Tr. 167:15-19.)

45.     In late 2008 and early 2009, Harris negotiated a $12.5 million financing deal, with funding scheduled to occur in March 2009.  (Tr. 509:8–510:10; Def.'s Trial Ex. 20.)  However, in early March, prior to receipt of the funds, the bank canceled the transaction.  (Tr. 510:11-22.)

46.     On March 27, 2009, as a result of losing this funding, the Board of Directors voted to retain The Platinum Group, a turnaround consultant.  (Tr. 170:4-20, 452:22–457:2; Def.'s Trial Exs. 30, 37, 66; see Joint Stip. ¶ 11.)  The Platinum Group's lead consultant was designated Faribault Mills's Chief Restructuring Officer ("CRO").  (Tr. 457:4-11; Def.'s Trial Exs. 37, 66.)  Faribault Mills's financial, human resources, and sales departments were to report to the CRO.  (Tr. 457:14-17; Def.'s Trial Ex. 66.)  Weinand testified that this decision took financial control away from Harris.  (Tr. 449:14-20, 457:23-25.)  Similarly, Harris had stated in a March 26 email that, should The Platinum Group be retained in this manner, he would have no role except raising capital.  (Def.'s Trial Ex. 37.)

47.     The Platinum Group created an Informal Plan of Reorganization, dated April 24, 2009.  (Tr. 381:11-24; Pl.'s Trial Ex. 289.)  The plan was presented to Faribault Mills's Board of Directors, as well as to Ed Dolan, a representative of the Schwan Foundation.  (Tr. 385:19–386:4.)

48.     Harris formally resigned as CEO in May 2009, but he remained on the Board of Directors.  (Tr. 515:7-14.)

49.     Dorr remained employed at Faribault Mills after Harris no longer held the title or power of CEO.  (Joint Stip. ¶ 15.)

50.     In a May 21, 2009 presentation, The Platinum Group described Faribault Mills's situation, noting that The Platinum Group was overseeing the business, its personnel was managing the unsecured creditors and cash flow, and Harris was no longer on the payroll.  (Tr. 515:8-25; Def.'s Trial Ex. 49 at 3.)

51.     According to Dean Bachelor of The Platinum Group, Dolan would not allow Faribault Mills to move forward with the reorganization plan.  (Tr. 386:5-7.)  Instead, Dolan took control of Faribault Mills's finances.  (Tr. 386:8–387:8, 459:23-24.)  Harris testified that this change of control occurred after March 2009, but Bachelor testified that it occurred in June or July of 2009—several months after The Platinum Group was retained.  (Tr. 386:8–387:8, 459:23-24.)

52.     Bachelor also testified that, when Dolan refused to move forward with any payments to creditors, The Platinum Group walked away from the engagement.  (Tr. 388:9-14.)

53.     Faribault Mills was then liquidated, and the Schwan Foundation controlled how the assets from the liquidation were used.  (Tr. 172:5-11, 388:15–389:15.)  According to Weinand, Harris demanded that the employees who had their health insurance premiums withheld from their paychecks be reimbursed, but that reimbursement was never made.  (Tr. 461:3–462:13.)  Weinand stated that, to the extent a decision to not reimburse the employees was made, it was made by Dolan and the Schwan Foundation.  (Tr. 462:14-21.)

**Uses of Faribault Mills Accounts During the First Quarter of 2009**

54.     During the first quarter of 2009, both Harris and Dorr were instructed by Weinand and Michel not to issue checks unless there were funds in the account to cover the checks.  (See Tr. 185:6-19, 452:22–453:22, 495:22-25; Def.'s Trial Ex. 30 at 1.)

55.     From at least January 2009 through March 2009, Faribault Mills used checking account number XXXXXX3830 to pay employee wages.  (Joint Stip. ¶ 23.)  The payroll checks were signed by Harris.  (See Tr. 145:10-13; Pl.'s Trial Exs. 168–73.)

56.     Faribault Mills paid general corporate expenditures and remitted health plan insurance premiums using checking account number XXXXXX2386.  (Joint Stip. ¶ 25.)  The total debits to that account during the first quarter of 2009 were:  $303,632.01 in January 2009; $324,686.83 in February 2009; and $246,240.52 in March 2009.  (Pl.'s Trial Exs. 32 at 8, 33 at 10, 34 at 9.)

57.     In addition to issuing checks to HealthPartners forwarding premiums for the Health Plan, Faribault Mills issued checks to other Faribault Mills creditors between January and March 2009 from account number XXXXXX2386.  (Id. ¶ 37.)  Harris testified that personnel from the Finance Department determined which checks to present to him for

his signature, and that he believed that the health insurance had been paid when he signed those checks.  (Tr. 492:13–493:1, 494:3-9.)

58.     Electronic debits also were made from account number XXXXXX2386 to a variety of sources, including Xcel Energy.  (Joint Stip. ¶ 37; see Pl.'s Trial Ex. 33 at 7.) Between March 26 and March 31, 2009, in particular, over $70,000 was either transferred to other Faribault Mills's accounts or was used to pay creditors and expenses.  (See Pl.'s Trial Ex. 34 at 8.)  This amount includes several payments that were made to Harris's personal accounts, such as the following:

a.    On March 27, 2009, a wire transfer in the amount of $1,500 was made from account number XXXXXX2386 to the account of Harris and his wife.  (Pl.'s Trial Ex. 34 at 8; Tr. 136:24–137:13.)

b.    On March 30, 2009, a payment of $4,000 was made from account number XXXXXX2386 to Harris's American Express account.  (Pl.'s Trial Exs. 34 at 8, 105 at 2; Tr. 137:6-9.)  Harris directed that this payment be made.  (Tr. 138:7-22.)

c.    On March 31, 2009, a payment of $21,531.48 was made from account number XXXXXX2386 on Harris's home equity line of credit.  (Pl.'s Trial Exs. 34 at 9, 105 at 3; Tr. 519:4–520:12.)  Harris testified that he asked Dorr to make this payment after speaking with her and determining that Faribault Mills would be unable to make the full HealthPartners premium that was due.  (Tr. 520:13-25; see Tr. 138:7-22.)

59.     Craig testified that Harris occasionally charged personal items to the corporate credit card or had Faribault Mills reimburse him for personal expenditures to

offset the expenses due to him on his expense report.  (Tr. 269:23–270:4.)  Similarly, Dorr

testified that Harris was not reimbursed for all of his business expenses.  (Tr. 168:8-10.)

60.     Harris cashed only one paycheck during the first quarter of 2009, (Joint Stip.

¶ 38), and he testified that, as of March 18, 2009, he was owed at least $31,000 in business

expenses, (Tr. 522:4-9).

61.     During the first quarter of 2009, many deposits also were made into account

number XXXXXX2386, totaling:  $356,395.12 in January 2009; $260,394.36 in February

2009; and $250,355.12 in March 2009.  (Pl.'s Trial Exs. 32 at 5, 33 at 7, 34 at 6.)  Dorr

testified that, because the amount of deposits exceeded the amount owed to HealthPartners,

the premiums at issue could have been paid.  (Tr. 136:7-11.)

### Damages

62.     Six sets of payroll checks were issued to Faribault Mills employees between

January 9, 2009 and March 20, 2009, from which a total of $55,040.61 in health insurance

premiums was withheld:  $9,482.22 from the January 9, 2009 paychecks; $9,193.69 from

the January 23, 2009 paychecks; $9,379.57 from the February 6, 2009 paychecks; $9,173.61

from the February 20, 2009 paychecks; $8,905.76 from the March 6, 2009 paychecks; and

$8,905.76 from the March 20, 2009 paychecks.  (See Pl.'s Trial Exs. 168–73, 195–263,

292.)

63.     Although Faribault Mills withheld the $55,040.61 in employee health

insurance premiums from the employees' paychecks between January 9, 2009 and March

20, 2009, (Pl.'s Trial Ex. 292), Faribault Mills neither remitted that money to HealthPartners

nor refunded it to the employees from whose paychecks it had been withheld, (see Tr. 144:6–145:9, 335:2–336:6).

64. The lost opportunity cost on this amount, calculated through June 1, 2015, is $12,798.99. (Tr. 401:20–403:12.)

## III. CONCLUSIONS OF LAW

### Jurisdiction and Venue

1. ERISA applies to "any employee benefit plan if it is established or maintained . . . by any employer engaged in commerce or in any industry or activity affecting commerce." 29 U.S.C. § 1003(a). "Employee benefit plan" is defined as "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." Id. § 1002(3). An "employee welfare benefit plan" means "any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . . ." Id. § 1002(1).

2. The Health Plan is an "employee benefit plan" within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3), which is subject to the provisions of Title I of ERISA pursuant to ERISA § 4(a), 29 U.S.C. § 1003(a). (Joint Stip. ¶ 2.)

3. The Court has jurisdiction over this action pursuant to ERISA § 502(a)(2), (a)(5), and (e)(1), 29 U.S.C. § 1132(a)(2), (a)(5), and (e)(1), which permit the Secretary to

bring a civil action for appropriate relief under 29 U.S.C. § 1109 and to enjoin or obtain

other equitable relief to redress violations of 29 U.S.C. §§ 1104 and 1106.

4.      Faribault Mills was the Health Plan's Plan Administrator within the meaning

of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), was a named Health Plan fiduciary within

the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and was a party in interest to

the Health Plan within the meaning of ERISA § 3(14)(A) and (C), 29 U.S.C. § 1002(14)(A)

and (C).  (Joint Stip. ¶ 19.)

5.      Venue of this action lies in the District of Minnesota because the Health Plan

was administered in Faribault, Rice County, Minnesota, which is within this District.  29

U.S.C. § 1132(e)(2).

### Burden of Proof

6.      In order to prevail in this ERISA action, the parties' claims or defenses must

be proven by a preponderance of the evidence.  See CIGNA Corp. v. Amara, 131 S. Ct.

1866, 1881 (2011) ("[A] fiduciary can be surcharged under § 502(a)(3) only upon a

showing of actual harm—proved (under the default rule for civil cases) by a preponderance

of the evidence."); White v. Martin, 286 F. Supp. 2d 1029, 1032 (D. Minn. 2003) (stating

that the court's findings of fact were either undisputed or were proven by a preponderance

of the evidence at trial in an ERISA case brought under 29 U.S.C. § 1109).

### Fiduciary Status

7.      The threshold question in this case is whether Harris was a "fiduciary" with

respect to the Health Plan.  See Trs. of the Graphic Commc'ns Int'l Union Upper Midwest

Local 1M Health & Welfare Plan v. Bjorkedal, 516 F.3d 719, 732 (8th Cir. 2008) (quoting

Pegram v. Herdrich, 530 U.S. 211, 226 (2000)) ("'In every case charging breach of ERISA fiduciary duty, . . . the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.'").

8.     Under ERISA, "a person is a fiduciary with respect to a plan to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i). "The term fiduciary is to be broadly construed . . . ." Consol. Beef Indus., Inc. v. N.Y. Life Ins. Co., 949 F.2d 960, 964 (8th Cir. 1991).

9.     As the Eighth Circuit Court of Appeals has noted, "this [definition] imposes fiduciary duties only if one exercises <u>discretionary</u> authority or control over plan <u>management</u>, but imposes those duties <u>whenever</u> one deals with plan <u>assets</u>." FirsTier Bank, N.A. v. Zeller, 16 F.3d 907, 911 (8th Cir. 1994). Thus, ERISA "imposes fiduciary obligations on individuals who are not named as fiduciaries but nonetheless exercise actual authority over plan assets." Bjorkedal, 516 F.3d at 733; see Olson v. E.F. Hutton & Co., 957 F.2d 622, 625 (8th Cir. 1992) (stating that ERISA "imposes fiduciary status upon those who act like fiduciaries as well as those who actually are fiduciaries," and "the absence of any grant of authority . . . does not automatically preclude a finding that [an individual] is a fiduciary"); In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig., 312 F. Supp. 2d 1165, 1175 (D. Minn. 2004) (citing 29 U.S.C. § 1002(21)(A)) (stating that "a person may be

deemed a fiduciary on the basis of his or her functional authority and control relative to the plan").

10.    "[T]he assets of the plan include . . . amounts that a participant has withheld from his wages by an employer, for contribution or repayment of a participant loan to the plan, as of the earliest date on which such contributions or repayments can reasonably be segregated from the employer's general assets."  29 C.F.R. § 2510.3-102(a)(1).  With respect to an employee welfare benefit plan, this date shall not occur later than "the date on which such amounts would otherwise have been payable to the participant in cash (in the case of amounts withheld by an employer from a participant's wages)."  Id. § 2510.3-102(c).  In other words, employee contributions to a health plan become plan assets "once they [are] withheld from the employees' paychecks."  Bjorkedal, 516 F.3d at 733.

11.    The Eighth Circuit applied these principles in Trustees of the Graphic Communications International Union Upper Midwest Local 1M Health & Welfare Plan v. Bjorkedal.  In that case, the trustees of an employee benefit welfare plan alleged that Bjorkedal, who was a corporate officer and the company's majority shareholder, breached his fiduciary duties by failing to remit contributions (both employer contributions and payments withheld from employee paychecks) to the plan.  Id. at 723–26.  Although the court determined that the monies withheld from the employees' paychecks were plan assets, the court concluded that Bjorkedal was not a fiduciary because he did not "exercise actual authority over plan assets."  Id. at 733.  "[T]he only evidence in the record [was] that Bjorkedal was not personally involved in the decision not to remit the employee withholdings to the [plan], or for that matter, any of the decisions regarding which creditors

got paid and which did not[,]" and that "[the CFO] handled all financial matters, informing Bjorkedal only when cashflow was insufficient to make payroll." Id. The court also rejected the trustees' argument that Bjorkedal was at fault for failing to ensure that the employee withholdings were remitted because "[a]n act of omission fails to satisfy the requirement that the individual exercise discretionary authority over plan assets." Id.

12.     This Court finds that the $55,040.61 in employee health insurance premiums that were withheld from the Faribault Mills's employees' paychecks between January 9, 2009 and March 20, 2009—and neither remitted to HealthPartners nor refunded to the employees—are "plan assets," and they became so as of the date on which the employees' wages were paid (i.e., the date on which the employees' contributions were withheld).

13.     The Court also finds that Harris exercised authority or control respecting the management or disposition of those plan assets. For example, Dorr testified that she did not have the authority, without Harris's approval, to remit employee contributions to HealthPartners. Indeed, the checks to HealthPartners were signed by Harris. Moreover, when Glienke brought HealthPartners's past-due notices to Harris's attention, Harris asked Glienke to try to get an extension—or, in March 2009—called HealthPartners himself to request an extension.

14.     Bjorkedal does not mandate a different result.

a.  First, Harris was generally much more involved with Faribault Mills's financial matters than Bjorkedal was with his company's financial affairs. Not only did Dorr provide Harris with monthly financial statements, cash flow reports, and—during the first quarter of 2009—

23

daily balances of the bank accounts, but she compiled lists of creditors and vendors who needed to be paid and discussed those lists with Harris.

b. Second, unlike Bjorkedal, Harris was personally involved in decisions regarding which creditors were paid.  Dorr, Michel, and Harris all testified that Harris had ultimate authority during at least the first quarter of 2009 to determine which of Faribault Mills's expenses would be paid.

c. Finally, unlike Bjorkedal, Harris was personally involved—and exercised his authority—in the decision not to remit employee withholdings to the Health Plan, which is the action subject to complaint in this case.  Harris testified that, after speaking with Dorr and determining that Faribault Mills would be unable to pay the full premium due to HealthPartners, he directed Dorr to instead use the funds available in the checking account from which premiums were paid to make a March 31, 2009 payment on his home equity line of credit.

15.     Nor does Harris's testimony that the Finance Department determined when and how to pay HealthPartners and other corporate expenses, or his testimony that he was not involved with the day-to-day management of Faribault Mills's cash flow, lead to a different result.  The Court finds that his former claim lacks credibility given the great weight of evidence to the contrary discussed above.  As for the latter claim, the question of

fiduciary status does not hinge on whether an individual is intimately involved in—and exercises authority or control over—every financial matter within a company. Rather, the relevant inquiry under ERISA is whether the individual "exercises any authority or control respecting <u>management or disposition of [plan] assets</u>." And, as discussed above, Harris did exercise such authority and control.

16. Accordingly, the Court finds that Harris was a fiduciary to the Health Plan from at least January 1, 2009 to March 31, 2009.

### Duty of Loyalty Claim

17. "[A] breach of fiduciary duty claim involves a three-step analysis. ERISA plaintiffs bear the burden of proving a breach of fiduciary duty and a prima facie case of loss to the plan. Once the plaintiff has satisfied these burdens, the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by . . . the breach of duty." <u>Roth v. Sawyer-Cleator Lumber Co.</u>, 16 F.3d 915, 917 (8th Cir. 1994) (internal citations and quotation marks omitted).

18. The Court finds that the Secretary has met his burden of proving a breach of fiduciary duty and a prima facie case of loss to the plan, but that Harris has not met his burden to prove that the loss was not caused by the breach of duty.

19. As for breach of fiduciary duty, ERISA § 404(a)(1)(A)(i) provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A)(i). This provision codifies the duty of loyalty, which requires fiduciaries to act with an "eye single" to the interests

of participants.  Pegram, 530 U.S. at 235.  The fiduciary "must display . . . complete

loyalty to the interests of the beneficiary and must exclude all selfish interest and all

consideration of the interests of third persons."  Id. at 224 (citation and internal quotation

marks omitted).  In addition, "the duty of loyalty requires fiduciaries to deal fairly and

honestly with all plan members."  Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 598

(8th Cir. 2009) (citation and internal quotation marks omitted).

20.     Several courts have determined that a fiduciary breaches his duty of loyalty

when he fails to remit plan assets to the plan and instead causes those assets to be used to

pay corporate creditors and personal expenses.  See Solis v. Blackford, 759 F. Supp. 2d

1121, 1124 (D. Minn. 2011) (finding a breach of the duty of loyalty where the employer

withheld its employees' pension plan contributions from their paychecks, commingled those

funds with the company's general assets, and then paid creditors from the general account);

Chao v. Crouse, 346 F. Supp. 2d 975, 987 (S.D. Ind. 2004) (finding that the fiduciaries

breached their duty of loyalty by depositing health plan assets into corporate accounts and

then using those assets for corporate or personal benefit); Connors v. Paybra Mining Co.,

807 F. Supp. 1242, 1246 (S.D.W.V. 1992) (finding a breach of the duty of loyalty where

"[f]und assets, in the form of due and owing contributions, were either diverted for other

purposes or simply not paid as a result of the [fiduciaries'] personal, discretionary control

and management of such [assets]"); Prof'l Helicopter Pilots Ass'n v. Denison, 804 F. Supp.

1447, 1453–54 (M.D. Ala. 1992) (finding that the fiduciaries breached their duty of loyalty

by failing to segregate and pay to the employee welfare benefit fund the withheld employee

contributions and instead diverting those assets for other purposes).

21.     This Court likewise finds that Harris breached his duty of loyalty to the Health Plan by failing to remit plan assets to the Health Plan and instead using those assets to pay corporate creditors and personal expenses. As discussed above, the $55,040.61 in employee health insurance premiums that were withheld from the Faribault Mills's employees' paychecks between January 9, 2009 and March 20, 2009—and neither remitted to HealthPartners nor refunded to the employees—are "plan assets." As a fiduciary regarding those plan assets, Harris had a duty to display complete loyalty to the interests of the participants and beneficiaries in his dealings with those plan assets and to exclude all selfish interest and all consideration of the interests of third persons. He breached that duty when, in late March 2009—after he claims he first learned that the January and February premiums had not been remitted to HealthPartners—he directed or allowed funds from checking account number XXXXXX2386 to be used to pay Faribault Mills's expenses and debts instead of the HealthPartners premiums. Thus, Harris breached his duty of loyalty by exercising authority and control over Health Plan assets to benefit himself and Faribault Mills at the expense of the Health Plan participants and beneficiaries.

22.     As for loss, ERISA § 409(a) looks to the loss caused to the plan, not to individual beneficiaries. 29 U.S.C. § 1109(a); Roth, 16 F.3d at 919. Here, the Secretary proffered evidence that a total of $55,040.61 in health insurance contributions was withheld from Faribault Mills's employees' paychecks between January 9, 2009 and March 20, 2009, and was neither remitted to HealthPartners to pay the health insurance premiums nor refunded to the employees from whose paychecks it had been withheld. This was a loss to the plan. See Blackford, 759 F. Supp. 2d at 1124–25 (stating that fiduciaries who breach

their duties are liable to make good any losses to the plan resulting from the breach, which "include[] withheld Plan contributions that were not remitted to the Plan, along with prejudgment interest"). Although Harris argues that losses are limited to the $9,286.69 in health insurance claims that were denied as a result of the termination of the Health Plan, that amount was a loss to the individual beneficiaries.

23.     Finally, as for causation, Harris's decision not to remit the employee withholdings to HealthPartners caused the $55,040.61 loss to the Health Plan. Although Harris contends that he first learned that the premiums had not been remitted on March 26, and that it was then too late to make the payment because there were insufficient funds available, the evidence demonstrates that over $70,000—including the $21,531.48 payment on Harris's home equity line of credit—was transferred or paid out of checking account number XXXXXX2386 between March 26 and March 31. In other words, the evidence shows that an amount of money significantly higher than the amount of premiums that was due to HealthPartners was removed from the account from which premiums were paid and was neither paid to HealthPartners nor returned to the employees, but instead was used to pay other corporate expenses or debts. Accordingly, Harris has not adequately demonstrated that the payment could not have been made but for his decision not to remit the funds and, therefore, has not met his burden to prove that the loss was not caused by his breach of duty.

## Prohibited Transactions Claim

24.     In light of the Court's determination that Harris is liable under ERISA § 404(a)(1)(A) for breach of fiduciary duty, the Court declines to address the Secretary's

claim that Harris also is liable for engaging in prohibited transactions in violation of ERISA

§ 406.  Accordingly, the Secretary's Motion in Limine to Narrow the Issues at Trial, which

concerned whether ERISA's proscriptions in § 406(a)(1)(D) against prohibited transactions

and self-dealing require a subjective intent to benefit a party in interest, is denied as moot.

## Relief

25.     Pursuant to ERISA § 409(a):

> Any person who is a fiduciary with respect to a plan who
> breaches any of the responsibilities, obligations, or duties
> imposed upon fiduciaries by this subchapter shall be personally
> liable to make good to such plan any losses to the plan resulting
> from each such breach, and to restore to such plan any profits
> of such fiduciary which have been made through use of assets
> of the plan by the fiduciary, and shall be subject to such other
> equitable or remedial relief as the court may deem appropriate,
> including removal of such fiduciary. . . .

29 U.S.C. § 1109(a).

26.     Courts have interpreted ERISA to permit awards of prejudgment interest.  See

Kerr v. Charles F. Vatterott & Co., 184 F.3d 938, 945 (8th Cir. 1999) ("Prejudgment interest

awards are permitted under ERISA where necessary to afford the plaintiff 'other appropriate

equitable relief' under section 1132(a)(3)(B)."); Blackford, 759 F. Supp. 2d at 1124–25

(stating that the loss that a fiduciary who breaches his duties is liable to make good includes

prejudgment interest).  As the Eighth Circuit has stated, "[a] common thread throughout the

prejudgment interest cases is unjust enrichment—the wrongdoer should not be allowed to

use the withheld benefits or retain interest earned on the funds during the time of the

dispute."  Kerr, 184 F.3d at 946.

27.     "'The question of whether interest is to be allowed, and also the rate of computation, is a question of federal law where the cause of action arises from a federal statute.'" Mansker v. TMG Life Ins. Co., 54 F.3d 1322, 1330 (8th Cir. 1995) (quoting Dependahl v. Falstaff Brewing Corp., 653 F.2d 1208, 1218 (8th Cir. 1981)).  Here, the Secretary has suggested that the Court use 26 U.S.C. § 6621(a)(2), the Internal Revenue Code standard for interest, to calculate prejudgment interest in this case.  Harris did not suggest an alternative rate.

28.     Courts have also interpreted ERISA to permit entry of a permanent injunction against a fiduciary who has engaged in "'serious misconduct'" to prohibit him from acting as a fiduciary and from providing direct or indirect services to an ERISA-covered plan. Martin v. Feilen, 965 F.2d 660, 672 (8th Cir. 1992) (quoting Beck v. Levering, 947 F.2d 639, 641 (2d Cir. 1991)) ("'ERISA imposes a high standard on fiduciaries, and serious misconduct that violates statutory obligations is sufficient grounds for a permanent injunction.'").

29.     The Court finds that the Health Plan incurred a loss of $55,040.61 in unpaid employee contributions due to Harris's breach of the duty of loyalty, and that Harris is liable for restitution of that amount.

30.     The Court finds that an award of $12,798.99 in prejudgment interest (calculated through June 1, 2015) also is appropriate.  By failing to remit the employee health insurance premiums withheld from the Faribault Mills's employees' paychecks, Harris had the unjust benefit and use of those monies.

31.     Finally, the Court finds that injunctive relief is not appropriate in this case. Although there would have been a sufficient basis to remove Harris as a fiduciary of the Health Plan, the Health Plan is no longer in existence, and Harris's conduct was not so egregious as to warrant a broader injunction on his ability to serve as a fiduciary or service provider to any ERISA-covered employee benefit plan.

## IV.     ORDER

Based on the Court's Findings of Fact and Conclusions of Law, **IT IS HEREBY**

**ORDERED THAT**:

1.     Defendant Harris was a fiduciary to the Faribault Mills Health Plan from at least January 1, 2009 through March 31, 2009;

2.     Defendant Harris breached his fiduciary duties and violated ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

3.     Defendant Harris is liable for restitution of the $55,040.61 in unremitted employee health insurance premiums that were withheld from the Faribault Mills's employees' paychecks in January 2009, February 2009, and March 2009;

4.     Defendant Harris is also liable for $12,798.99 in prejudgment interest on the unremitted health insurance premiums from January 2009, February 2009, and March 2009, as calculated through June 1, 2015; and

5.     The Secretary of Labor's Motion in Limine to Narrow the Issues at Trial [Doc. No. 93] is **DENIED AS MOOT**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  November 9, 2015                    s/Susan Richard Nelson
                                            SUSAN RICHARD NELSON
                                            United States District Judge